Prudential Insurance Company of America *v.* Kudoba et al., Appellants.

Argued December 9, 1935.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Charles D. McAvoy,* for appellants.

*Kendall H. Shoyer,* with him *Frederick J. Shoyer* and *Fox & McTighe,* for appellee.

OPINION BY CUNNINGHAM, J., February 28, 1936:

The personal representatives of Catherine Bury have appealed from a decree of the court below requiring that two policies of life insurance, issued by the plaintiff insurance company upon the life of John Bury and naming her as beneficiary, be delivered up for cancellation.

Each policy was in the sum of $1,000 and dated October 10, 1932. John Bury, the insured, died thirteen days later and Catherine Bury, the beneficiary, on May 6, 1933. Letters of administration upon her estate were issued to her daughters, the original defendants named in the bill and the only appellants herein.

The applicable portion of the incontestability clause of each policy reads: "This policy shall be incontestable after one year from its date of issue, except for nonpayment of premium." No suit was brought upon either policy and the insurance company, a few days before the expiration of the year, filed the present bill in equity, praying that the representatives of the beneficiary be ordered to deliver up the policies for cancellation upon the ground that they had never been in effect because the insured was not "in sound health" upon their date, but for a long time prior thereto had been suffering from pulmonary tuberculosis and other serious diseases which resulted in his death on October 23, 1932.

At the first hearing it developed that the policies were not in the possession of the original defendants but had been placed by them in the hands of their former attorney, W. J. Moran, Jr., Esq., for collection from plaintiff. Pursuant to Equity Rule 17, the court directed the joinder of Moran as a party defendant; he answered he was holding the policies under an alleged lien upon them for his fees for professional services. As to this feature of the case, the learned chancellor, KNIGHT, P. J., correctly held that whatever might be the rights of Moran as against his former clients, he could not assert them against the plaintiff, because, if the representatives of the beneficiary were not entitled to retain the policies, Moran's rights could rise no higher than theirs.

The final decree directed Moran to surrender the policies to the plaintiff and ordered the original defend-

ants to pay the costs; Moran has not appealed. That decree was based upon findings of the chancellor that the insured was suffering from tuberculosis on August 26, 1932, and could not have been in sound health when the policies were issued. It was admitted the plaintiff made an unaccepted tender to the original defendants of the amount of the premiums ($12.72) collected upon the policies.

Appellants contend the court below applied a wrong rule of law in construing the "sound health" clause in these policies. They argue the chancellor should have assumed the insured made written applications for the policies and should have found from the testimony that he had been examined and passed by a medical examiner representing the plaintiff company. Upon this theory, they invoke the rule that where there has been a medical examination the "sound health" clause refers only to illness and disease contracted by the insured subsequent to the medical examination and prior to the issuing of the policy, with the result that the company must rely upon the statements in the application rather than upon the condition in the policy.

Their difficulty is that no foundation was laid in this record for the application of the rule for which they contend. Insofar as written applications are concerned, no copies of such applications were endorsed upon or attached to the policies. Moreover, it was expressly provided therein that the policies should constitute the entire contract between the parties. The premiums were payable on or before the tenth day of each month and an examination of the portion of one of the policies printed with the record seems to indicate that these contracts were policies of industrial insurance, within the meaning of Section 410 of the Act of May 17, 1921, P. L. 682, 720, entitled "An act relating to insurance," etc., as amended by the Act of July 15, 1935, P. L. 1020.

An examination of the record fails to disclose any

competent evidence from which a chancellor would be justified in finding that the insured had been examined and passed by any medical examiner for plaintiff. It is true that appellants, in the paragraph of their answer in which they averred the insured was, to the best of their knowledge, in sound health at the date of the policies, added that he was "at that time examined by a physician representing said plaintiff company, which said physician averred that the said John Bury was in sound health." No effort, however, was made by appellants at the trial to substantiate this averment by any legally sufficient evidence. The only references we find to a medical examination at the instance of plaintiff are in the form of various intimations and assumptions contained in questions propounded by appellants' counsel, while cross-examining a physician called by plaintiff to support its contention that the insured was not in sound health. For example, one of these questions reads: "If I told you he (the insured) was examined five weeks afterwards by a physician and found to be in sound health, would that alter your opinion?" Again, while counsel for plaintiff was examining Katherine Kudoba (one of the appellants and a daughter of the beneficiary) with respect to other policies of insurance taken out by the insured, one of his questions was: "Do you know who was the doctor that examined John for the Prudential Insurance Company?" to which she replied, "I don't think I do. I don't know who examined him for the Prudential Insurance Company."

We think the chancellor was justified in holding, as he did, that there was no evidence which would support a finding that any medical examination had been made on behalf of plaintiff. Under this record we must treat the policies as having been issued without written applications or medical examination.

Nor can there be any question about the jurisdiction of equity to grant the relief here sought if plaintiff

established its attack on the validity of the policies to the satisfaction of the chancellor. See Equitable Life Assur. Soc. v. Klein et al., 315 Pa. 156, 173 A. 188, and New York Life Insurance Co. v. W. Bodek Corp., 320 Pa. 347, 182 A. 384.

Turning, then, to the controlling paragraph of the policies, we find it is headed "Preliminary Provision" and reads:

"This policy shall not take effect if on the date hereof the insured be not in sound health, but in such event the premium or premiums paid hereon, if any, shall be returned." Such provisions have been before our courts frequently. In the case of Youngblood, Adm., v. The Prudential Insurance Company of America, 109 Pa. Superior Ct. 20, 165 A. 666, this court, speaking through KELLER, J., (now President Judge) repeated that such a provision "is a condition and not a covenant"; that it operates more strongly in favor of the company than even a covenant in the policy that the answers to questions in the application shall be deemed warranties; and said, "it goes to the very heart or essence of the insurance contract." The cases holding that an insurance company has the right to protect itself by incorporating such a condition in the contract are cited in that opinion and need not be repeated here. It is well established that the inquiry under such a provision relates to actual conditions at the time the contract was made and not to the knowledge possessed by the insured of these conditions.

The evidence upon which plaintiff chiefly relied to support its contention that Bury was not in sound health upon the date the policies were issued was the uncontroverted testimony of Dr. J. C. Simpson, a physician engaged largely in laboratory practice. He testified that on August 26, 1932, a man, giving his name as John Bury and his address as 601 Green Street, Bridgeport, (the address at which the insured admit-

tedly lived at that time) brought a sample of sputum to his office for examination; that his investigation showed the presence of "many tubercular bacilli"; and that when the man returned in a couple of days he told him he had tuberculosis and should take the report of the examination to his doctor.

Based upon the results of his examination of the sputum, the witness expressed his positive opinion that the person whose sputum it was could not be in sound health six weeks later. As the physician testified that the first time he had seen the man was when he called with the specimen in a container, it is earnestly argued by the able counsel for appellants there was not sufficient evidence that the sputum examined was that of the insured.

With respect to this contention, we adopt the following excerpt from the opinion of the court dismissing the exceptions to the decree nisi as an accurate summary and fair discussion of the evidence for plaintiff upon the issue of sound health:

"Dr. Simpson did not know Bury, but described him as a man in his late thirties, or early forties. The proofs of death reveal him as forty years of age. Dr. Simpson did not examine the sputum as a representative of the insurance company, or, with the knowledge that Bury was applying for insurance, or had insurance in mind. What motive could Bury have to substitute the sputum of another for his own, and, under the circumstances, what motive could any one have to impersonate Bury?

"We are of the opinion that the above uncontradicted evidence was sufficient to base a finding that it was John Bury, the insured, who took the sputum to Dr. Simpson, and that the sputum examined was the sputum of Bury.

"There was other evidence as to the health of Bury, evidence which came from witnesses more inclined to

help the defendants than the insurance company. He died thirteen days after the policies were issued. This, of course, is not conclusive evidence that he was not in sound health on October 10, 1932, but it is a fact to be considered. Ignatz Bury, with whom John Bury worked, testified that John told him some three or four weeks before his death, 'that he was pretty sick, pretty weak,' and 'that he was going to die.' John Vargo, a friend of, and co-worker with, John Bury, testified that he saw John taking medicine, about four or five weeks before he died, and when he asked what was wrong with him, John said he had a cold.

"To contradict this, the defendants called witnesses to show that John Bury did not lose a day at his employment. Also, the proofs of death were admitted in evidence. These show that the attending physician gave the cause of death as dysentery. The attending physician was not called as a witness, although available. There was no opportunity to sift and appraise his statement by cross-examination. The statement as to the cause of death in the proofs, was in the nature of a self serving declaration, and not entitled to very much weight."

After reviewing the entire record, we are satisfied the findings of fact of the chancellor are supported by sufficient competent evidence and we think the law has been properly applied to them.

Decree affirmed at the costs of appellants, but they may deduct from costs due appellee $12.72, the amount of the premiums paid.